**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

| | |
|---|---|
| JAMES YOUNG, individually and on behalf of all others similarly situated, | Case No.   3:23-CV-369-BJB |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| PHARMERICA CORPORATION and RES-CARE, INC. d/b/a BRIGHTSPRING HEALTH SERVICES, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff James Young ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself and on information and belief as to all other matters, brings this Class Action Complaint against Defendants PharMerica Corporation ("PM") and Res-Care, Inc., d/b/a Brightspring Health Services ("Brightspring") (collectively, "Defendants"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of himself and all other individuals ("class members")—totaling approximately 5,815,591 people who had their sensitive personal identifiable information ("PII") and protected health information ("PHI")—as defined by the Health Insurance Portability and Accountability Act ("HIPPA")—disclosed to unauthorized third parties that accessed and removed the PII and PHI from Defendants' systems between at least March 12 and March 13, 2023[1], if not longer (the "Data Breach").

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61.shtml  (last visited June 28, 2023).

2.      PM advertises itself as a "national leader in pharmacy services, serving our partners in over 3,100 long-term care, senior living, IDD/behavioral health, home infusion, specialty pharmacy, and hospital management programs with:

- 50 States Serving Patients
- 180+ Local Pharmacies
- 6,000 Local Professionals
- 70,000 Back-Up Pharmacies
- 24/7/365 Medication Availability
- 3,100 Facilities Being Served
- 60+ eMAR Integrations
- 96% Customer Retention
- 30+ Years of Experience"[2]

3.      Brightspring is the parent company of PM, and describes itself as providing clinical care, support services, and pharmacy services to seniors and high-needs patients.

4.      PM's website states "PharMerica team ensures the cornerstones of our care delivery system – medication availability, cost containment & reduction, and compliance and education – are represented in all we do. That's because a pharmacy today is about more than just filling orders. A community's future rests on successfully managing outcomes, spend, and risk. By partnering with us, we'll help you stay ahead of opportunities."[3]

5.      Defendants sent letters to Plaintiff and class members on or about May 12, 2023 and again on or about June 8, 2023 ("Notice Letter"), notifying them of the Data Breach and stating that their names, addresses, dates of birth, Social Security Numbers ("PII"), as well as their medications and health insurance information ("PHI") were compromised in the Data Breach.[4]

---

[2] https://pharmerica.com/who-we-are/ (last visited June 28, 2023).
[3] Id.
[4] A sample draft of PM's Notice Letter is accessible at:
https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61/7706ccf6-5b3e-4b8c-83f3-3a3852151b93/document.html   (last visited July 20, 2023).

6.      It has been reported that the Data Breach was a ransomware attack conducted by a new ransomware group, Money Message, which claims to have committed the Data Breach.[5] Money Message claims to have stolen 4.7 terabytes of data, consisting of 1.6 million unique records of highly sensitive PII and PHI.[6]

7.      It has been reported that Money Message requested an unspecified ransom from Defendants in exchange for Money Message to abstain from releasing consumers' highly sensitive PII and PHI, but that Defendants allegedly refused to pay that ransom in order to keep consumers'—such as Plaintiff's and Class members'—sensitive information safe .[7] As a result, on March 28, 2023, Money Message began publishing consumers' sensitive information stolen from Defendants' systems and continued to iteratively release the stolen data until all files exfiltrated from Defendants' systems were released on April 9, 2023.[8] Because the Data Breach was conducted by known, self-proclaimed ransomware hackers, Plaintiff's and class members' sensitive PII and PHI are irrefutably in the possession of known bad actors.

8.      Defendants' Notice Letter states that they discovered the Data Breach on March 21, 2023, but Defendants did not notify impacted individuals—including Plaintiff and class members—of the Data Breach until 52 days later, for those notified on May 12, 2023, and 79 days later for those notified on June 8, 2023.[9] Defendants' respective 52- and 79-day delay runs afoul of statements and promises contained in the Privacy Policy on PM's website recognizing that it is "required by law to: Maintain the privacy and security of your medical information, . . . Provide

---

[5] https://www.bleepingcomputer.com/news/security/ransomware-gang-steals-data-of-58-million-pharmerica-patients/ (last visited June 28, 2023).
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61.shtml (last visited June 28, 2023).

you with notice if a breach occurs that may have compromised the privacy or security of your medical information, [and] Abide by the terms of this Notice."[10]

9.      PM reported on the Maine Attorney General's website that on May 12, 2023 and June 8, 2023, it sent written notification to 5,815,591 individuals impacted by the Data Breach and informed them that their PII and PHI was compromised.[11] According to PM's Notice Letter, on May 14, 2023, PM discovered "suspicious activity on our computer network … and that an unknown third party accessed our computer systems from March 12-13, 2023, and that certain personal information may have been obtained from our systems as a part of the incident."[12] PM states further that on March 21, 2023, it "determined that the data contained personal information that included name, address, date of birth, Social Security number, medications, and health insurance information" for impacted individuals such as Plaintiff and class members.[13] The Data Breach resulted from PM's failure to adequately protect and safeguard the highly sensitive PII and PHI entrusted to it.

10.      Notably, PM's Notice Letter makes no mention that the Data Breach involved a ransomware attack, of the ransom demanded by Money Message, or PM's refusal to pay to prevent Money Message from publishing the highly sensitive PII and PHI.[14]

11.      PM owed a duty to Plaintiff and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII and PHI

---

[10] https://pharmerica.com/privacy-policy/ (last visited July 20, 2023).
[11] https://apps.web.maine.gov/online/aeviewer/ME/40/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last visited July 20, 2023).
[12] A sample draft of PM's Notice Letter is accessible at:
https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61.shtml (last visited July 20, 2023).
[13] *Id.*
[14] *Id.*; *see also* https://www.bleepingcomputer.com/news/security/ransomware-gang-steals-data-of-58-million-pharmerica-patients/ (last visited June 28, 2023).

against unauthorized access and disclosure. PM breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the PII and PHI entrusted to it from unauthorized access and disclosure.

12.     As a result of PM's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and class members' PII and PHI was accessed and disclosed by an unauthorized actor. This instant action seeks to remedy these failings and their consequences. Plaintiff thus brings this complaint on behalf of himself and all similarly situated individuals whose PII and/or PHI was exposed as a result of the Data Breach, which PM learned of on or about March 21, 2023, but did not publicly disclose until May 12, 2023.

13.     Plaintiff, on behalf of himself and all other class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, invasion of privacy, and unjust enrichment, and seeks declaratory and injunctive relief, monetary damages including punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

### A.    **Plaintiff James Young**

14.     Plaintiff James Young is a resident and citizen of the state of Michigan and resides in New Baltimore, Michigan.

15.     Plaintiff received a letter from PM dated June 14, 2023, confirming that his PII and PHI were impacted by the Data Breach. In the letter, PM informed Plaintiff that his "name, address, date of birth, Social Security number, medications, and health insurance information" were compromised in the Data Breach.

16.     Prior to retaining counsel for claims related to the Data Breach, Plaintiff spent at least an hour monitoring his accounts for fraudulent activity and identity theft. He will continue to expend further time doing so in the days, weeks, and months following the filing of this complaint.

**B.      Defendant PharMerica Corp.**

17.     Defendant PharMerica Corporation is a corporation incorporated in Delaware, with its headquarters and principal place of business at 805 N. Whittington Parkway, Louisville, Kentucky 40222. PM is a citizen and resident of the state of Kentucky.

**C.      Defendant Res-Care, Inc. (d/b/a BrightSpring Health Services)**

18.     Defendant Res-Care, Inc. (d/b/a BrightSpring Health Services) is a Kentucky corporation and maintains its headquarters and principal place of business at 805 N. Whittington Parkway, Louisville, Kentucky 40222.

<u>**JURISDICTION AND VENUE**</u>

19.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and is a class action in which one or more class members are citizens of states different from Defendants.

20.     The Court has personal jurisdiction over Defendants because they maintain their principal places of business in this judicial District, conduct significant business in Kentucky, and/or otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in Kentucky.

21.     Venue properly lies in this District because, *inter alia,* Defendants maintain their principal places of business in this judicial District; transact substantial business, have agents, and

are otherwise located in this District; and/or a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial District.

## FACTUAL ALLEGATIONS

**A.    Overview of Defendants**

22.    PM advertises itself as a "national leader in pharmacy services, serving our partners in over 3,100 long-term care, senior living, IDD/behavioral health, home infusion, specialty pharmacy, and hospital management programs with:

- 50 States Serving Patients
- 180+ Local Pharmacies
- 6,000 Local Professionals
- 70,000 Back-Up Pharmacies
- 24/7/365 Medication Availability
- 3,100 Facilities Being Served
- 60+ eMAR Integrations
- 96% Customer Retention
- 30+ Years of Experience"[15]

23.    Discovery will show that through its provision of the foregoing services, PM obtains possession of its customers'—including Plaintiff's and class members'—highly sensitive PII and PHI. Thus, in the regular course of its business, PM collects and maintains the PII and PHI of consumers. Upon information and belief, that information ordinarily includes: (1) patient demographic information (such as patient name, guarantor name, parent/guardian name, address, email address, and date of birth); (2) Social Security Numbers ("SSNs"), (3) driver's license numbers or other state-issued ID numbers, (4) insurance information (payer name, payer contract dates, policy information including type and deductible amount and subscriber number); (5) medical and/or treatment information (dates of service, location, services requested or procedures performed, diagnosis, prescription information, physician names, and Medical Record

---

[15] https://pharmerica.com/who-we-are/ (last visited on June 28, 2023).

Numbers); (6) billing and/or claims information (invoices, submitted claims and appeals, and patient account identifiers used by the provider); and (7) information of any parent, guardian, or guarantor. Defendants store this information digitally in the regular course of business.

24.     PM's website states "PharMerica team ensures the cornerstones of our care delivery system – medication availability, cost containment & reduction, and compliance and education – are represented in all we do. That's because a pharmacy today is about more than just filling orders. A community's future rests on successfully managing outcomes, spend, and risk. By partnering with us, we'll help you stay ahead of opportunities."[16]

25.     PM's "Code of Conduct" posted on its website assures consumers that it will comply with state privacy laws and HIPPA[17]:

> Officers, directors and employees and all other affected individuals must comply with … "HIPAA" … and state privacy laws protect the privacy and security of individually identifiable health information.

26.     Likewise, PM's Privacy Policy posted on its website promises that PM will comply with HIPPA: "The privacy practices described in this Notice will be followed by PharMerica and the entities under common ownership or control of PharMerica Corporation."[18]

27.     PM further states in its website Privacy Policy that it is "required by law to: Maintain the privacy and security of [consumers'] medical information" and promises to "[p]rovide [consumers] with notice if a [data] breach occurs that may have compromised the privacy or security of your medical information."[19]

---

[16] *Id.*
[17] https://pharmerica.com/wp-content/uploads/2021/01/PharMerica-Code-of-Conduct-20201119.pdf (last visited July 20, 2023).
[18] https://pharmerica.com/privacy-policy/
[19] *Id.*

28.     PM's Privacy Policy assures consumers that it will not share their sensitive information—which necessarily includes by letting a data breach access it—without first obtaining the consumers' written consent: "[o]ther uses and disclosures of your medical information not covered by this Notice will be made only with [consumers'] written authorization."[20]

29.     PM's Privacy Policy states that it retains Plaintiff's and class members' sensitive information, and promises that it takes steps to ensure their sensitive PII and PHI entrusted to it is safe[21]:

> We are committed to protecting privacy of your medical information. While you receive pharmacy services from us, we create records of the pharmacy services that we provide to you. We need these records to provide you with quality pharmacy services and to comply with law. This Notice describes your rights with respect to your medical information. This Notice also describes certain duties we have regarding your medical information and how we may use and disclose your medical information
>
> The privacy practices described in this Notice will be followed by PharMerica and the entities under common ownership or control of PharMerica Corporation, among which are Onco360, CareMed Specialty Pharmacy, Amerita and Chem Rx, which together form an affiliated covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the HIPAA privacy rules (collectively referred to as "We" or "Us" in this Notice).

30.     Furthermore, on its website, PM recognizes that it has a legal duty to safeguard sensitive PII and PHI entrusted to it[22]:

---

[20] *Id.*

[21] https://pharmerica.com/privacy-policy/ (last visited June 28, 2023).

[22] *Id.*

Our Duties Regarding Your Medical Information

We are required by law to:

• Maintain the privacy and security of your medical information,
• Provide you with this Notice about our legal duties and privacy practices with respect to your medical information,
• Provide you with notice if a breach occurs that may have compromised the privacy or security of your medical information, • Abide by the terms of this Notice.

31.     Defendants assure consumers and website visitors that Defendants' "commitment to compliance" ensures that employees "do it the right way, every day" by adhering to the "Inspector General's Seven Elements of an Effective Compliance Program"[23]:

> BrightSpring Health Holdings has a compliance program that requires our employees to do their jobs the right way every day. The program is modeled after the Office of Inspector General's Seven Elements of an Effective Compliance Program. We screen all potential employees to ensure they meet background screening requirements and are eligible to participate in federal healthcare programs. We distribute our Code of Conduct book during an employee's first days on the job. We want our employees to understand their responsibility to not only adhere to these principles of conduct, but also actively participate in and promote compliance within their workplace.  We are committed to the ideals of our mission and our Code of Conduct. We are equally committed to ensuring that our actions consistently reflect our words. In this spirit, BrightSpring Health Holdings' mission is to impact communities for the better and create optimal environments for people in need of assistance through attentive and quality service principles, so that they can live their best life.

32.     PM's "commitment to compliance" stated in its "Code of Business Conduct and Ethics" includes protecting PII and PHI from unauthorized users as outlined in HIPPA and other state privacy laws[24]:

---

[23] *Id.*

[24] PM's Code of Business Conduct and Ethics is accessible at:
https://pharmerica.com/wp-content/uploads/2021/01/PharMerica-Code-of-Conduct-20201119.pdf (last visited on June 28, 2023).

☐ **Compliance with HIPAA and State Privacy Laws**

Officers, directors and employees and all other affected individuals must comply with the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 and the regulations related to those provisions (collectively, "HIPAA") and state privacy laws protect the privacy and security of individually identifiable health information. Please see "Confidential Patient Information" later in this Code.

33.     To ensure that HIPAA-compliance policies and procedures are followed, and thus that PII and PHI are protected from unauthorized users, Defendants promise that their employees are trained "regarding the use and disclosure of patient information"[25]:

> Every officer and employee will receive training regarding the use and disclosure of patient information as appropriate for that person's job and business unit. Also you must read and comply with the Company's HIPAA policies and procedures. If you have any questions pertaining to confidential patient information, please contact the Company's Privacy Officer.

34.     As evidenced by, *inter alia*, their receipt of the Notice from PM informing them that their PII and PHI were compromised in the Data Breach, Plaintiff and class members are, or were, Defendants' patients or patients of healthcare professionals, managed care organizations, senior and independent living facilities/practices, transitional care facilities, long-term and post-acute facilities, and/or behavioral health facilities/practices that used Defendants' services, and thereby entrusted Defendants with their PII and/or PHI, from which Defendants profited.

35.     Yet, contrary to Defendants' website representations—by virtue of Defendants' admission that they experienced the Data Breach which revealed the PII and PHI of nearly 6 million individuals—Defendants did not have adequate measures in place to protect and maintain sensitive PII and PHI entrusted to them. Instead, Defendants' websites wholly fail to disclose the truth: that Defendants lack sufficient processes to protect the PII and PHI that is entrusted to them.

---

[25] *Id.*

**B.      The Data Breach**

36.      Defendants' Notice Letter disclosing the Data Breach states that on March 14, 2023, Defendants discovered "suspicious activity on our computer network … and that an unknown third party accessed our computer systems from March 12-13, 2023, and that certain personal information may have been obtained from our systems as a part of the incident."[26]

37.      The Notice Letter states further that on March 21, 2023, Defendants "determined that the data contained personal information that included name, address, date of birth, Social Security number, medications, and health insurance information."[27] Thus, known, malicious, unauthorized cybercriminals had access to Defendants' systems—and Plaintiff's and class members' sensitive PII and PHI stored thereon—for at least 24 hours, if not longer. Upon information and belief, the compromised information includes sensitive medical records, information related to health care and visits including care for individuals with intellectual and developmental disabilities, products and services offered to patients at their residences, and other forms of treatment.

38.      The Data Breach resulted from Defendants' failure to adequately protect and safeguard the highly sensitive PII and PHI entrusted to them.

39.      Defendants' Notice Letter states that the Data Breach was discovered on March 21, 2023, but Defendants did not notify impacted individuals—including Plaintiff and class members—of the Data Breach for **52 days,** for those that received notice on May 12, 2023, and **79 days** for those that received notice on June 8, 2023.[28]

---

[26] A sample draft of PM's Notice Letter is accessible at:
https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61.shtml (last visited July 20, 2023).
[27] *Id.*
[28] *Id.*

40.     Defendants' respective 52- and 79-day delays are contrary to multiple promises on PM's website that it is "required by law to: Maintain the privacy and security of [consumers'] medical information" and promises to "[p]rovide [consumers] with notice if a [data] breach occurs that may have compromised the privacy or security of your medical information."[29]

41.     Defendants reported on the Maine Attorney General's website that on May 12, 2023, they sent written notification to 5,815,591 individuals that of the Data Breach and informed those individuals that their PII and PHI were compromised.[30]

42.     As noted above, it is believed that the Data Breach was a ransomware attack conducted by Money Message, which itself claims to have committed the Data Breach.[31]

43.     Money Message emerged in March 2023 and has since proven to be a formidable ransomware group. Despite its relatively new status, it has claimed several high-profile ransomware attacks such as Micro-Star International (MSI).[32]

44.     Money Message claims to have requested an unspecified ransom from Defendants and Defendants allegedly refused to pay that ransom.[33] On March 28, 2023, Money Message began publishing the data stolen from Defendants' systems in the Data Breach, and continued to iteratively release the stolen data until all files exfiltrated from Defendants' systems were released on April 9, 2023.[34]

---

[29] *Id.*

[30] *Id.*

[31] https://www.bleepingcomputer.com/news/security/ransomware-gang-steals-data-of-58-million-pharmerica-patients/ (last visited on June 28, 2023).

[32] https://www.bleepingcomputer.com/news/security/new-money-message-ransomware-demands-million-dollar-ransoms/ (last visited June 28, 2023).

[33] https://www.bleepingcomputer.com/news/security/ransomware-gang-steals-data-of-58-million-pharmerica-patients/ (last visited June 28, 2023).

[34] *Id.*

45.     Money Message claims to have stolen 4.7 terabytes of data, consisting of 1.6 million unique records of personal information that it illegally exfiltrated from Defendants' systems.[35]

46.     Money Message uploaded that information—comprised of Plaintiff's and class members' highly sensitive PII and PHI—to its website on March 28, 2023 and listed it for sale on the dark web. Yet Defendants waited nearly two months after that date before notifying impacted individuals of the Data Breach.[36]

47.     Because the Data Breach was conducted by known, self-proclaimed ransomware cybercriminals, Plaintiff's and class members' sensitive PII and PHI are irrefutably in the possession of known bad actors. Furthermore, Plaintiff's and class members' PII and PHI are already listed for sale on the dark web, which places them at imminent risk that their data will be misused.

48.     Remarkably, noticeably absent from the Notice Letter is any mention, whatsoever, that the Data Breach involved a ransomware attack, of Money Message, of the ransom demanded by Money Message, of Defendants' refusal to pay to prevent Money Message from publishing Plaintiff's and class members' highly sensitive PII and PHI, or that impacted individuals' highly sensitive PII and PHI is already for sale on the dark web.

49.     As explicitly acknowledged and stated on their own websites, Defendants owed duties to Plaintiff and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII and PHI against unauthorized access and disclosure, and to promptly notify individuals of any breach involving their information.

---

[35] *Id.*

[36] *Id.*

Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect PII and PHI from unauthorized access and disclosure.

## C.    Defendants Knew that Criminals Target PII and PHI

50.    At all relevant times, Defendants knew, or should have known, their customers' patients', Plaintiff's, and all other class members' PII and PHI were a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and class members' information from cyber-attacks that Defendants should have anticipated and guarded against.

51.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were 758 medical data breaches in 2020 with over 40 million patient records exposed.[37] This is an increase from the 572 medical data breaches that Protenus compiled in 2019.[38]

52.    PII and PHI are valuable property rights.[39] The value of this information as a commodity is measurable.[40] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing

---

[37] Protenus, *2021 Breach Barometer*, PROTENUS.COM,
https://www.protenus.com/resources/2021-breach-barometer (last accessed Nov. 15, 2021).
[38] Protenus, *2020 Breach Barometer*, PROTENUS.COM,
https://www.protenus.com/resources/2020-breach-barometer (last accessed Nov. 15, 2021).
[39] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data
[40] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

legal and regulatory frameworks."[41] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[42] It is so valuable to identity thieves that once PII or PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

53.     As a result of the real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

54.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[43] A cyber criminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[44] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[45]

---

[41] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[42] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[43] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[44] *Id.*

[45] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

55.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[46] According to a report released by the FBI's Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[47]

56.     Criminals can use stolen PII and PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[48] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[49]

57.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[50]

58.     Given these facts, any company that transacts business with a consumer and then

---

[46] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[47] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[48] *What Happens to Stolen Healthcare Data*, *supra* at n.10.

[49] *Id.*

[50] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

compromises the privacy of that consumer's PII or PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

**D.      Theft of PII and PHI Has Grave and Lasting Consequences for Victims**

59.      Theft of PII and PHI is serious. The FTC warns consumers that identity thieves use PII and PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[51]

60.      Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[52] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[53]

61.      With access to an individual's PII or PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including obtaining a driver's

---

[51] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 15, 2021).

[52] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[53] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[54]

62.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[55]

63.     Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

64.     Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[56]

---

[54] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Nov. 15, 2021).
[55] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Nov. 15, 2021).
[56] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

65.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[57] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[58] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII and PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[59] The FTC also warns, "If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[60]

66.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought or received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[57] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf

[58] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* at n.14.

[59] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 15, 2021).

[60] *Id.*

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgages or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[61]

67.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for a consumer to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.[62]

68.    It is within this harsh and dangerous reality that Plaintiff and all other class members must now live with the knowledge that their PII and PHI are forever in cyberspace and were taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

**E.    Damages Sustained by Plaintiff and the Other Class Members**

69.    Plaintiff and all other class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and

---

[61] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, *supra* at 24.

[62] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

medical identity theft they face and will continue to face.

## CLASS ALLEGATIONS

70.    Plaintiff brings this action on behalf of himself and the following classes:

<u>Nationwide Class</u>: All residents of the United States who were notified by Defendants that their PHI and PII may have been compromised as a result of the Data Breach.

<u>Michigan Subclass</u>: All residents of Michigan who were notified by Defendants that their PHI and PII may have been compromised as a result of the Data Breach.

The foregoing classes are referred to herein, collectively, as the "Class." Excluded from the Class are: (1) the judges presiding over the action, Class Counsel, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly opt out; and (4) the successors or assigns of any such excluded persons.

71.    **Numerosity**: Class members are so numerous that their individual joinder is impracticable, as the proposed Class includes at least 5,815,591 members who are geographically dispersed.

72.    **Typicality**: Plaintiff's claims are typical of class members' claims. Plaintiff and all class members were injured through Defendants' uniform misconduct, and Plaintiff's claims are identical to the claims of the class members he seeks to represent.

73.    **Adequacy**: Plaintiff's interests are aligned with the Class he seeks to represent and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff and his counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiff and undersigned counsel.

74.   **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other class members' claims. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for class members individually to effectively redress Defendants' wrongdoing. Even if class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

75.   **Commonality and Predominance:** The following questions common to all class members predominate over any potential questions affecting individual class members:

    a.   Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and class members' PII and PHI from unauthorized access and disclosure;

    b.   Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and class members' PII and PHI;

    c.   Whether Defendants breached their duties to protect Plaintiff's and class members' PII and PHI;

    d.   Whether an implied contract existed between class members and Defendants providing that Defendants would implement and maintain reasonable security

measures to protect and secure class members' PII and PHI from unauthorized

access and disclosure;

e.  Whether Plaintiff and all other class members are entitled to damages and the

measure of such damages and relief.

76.  Given that Defendants engaged in a common course of conduct as to Plaintiff and

the Class, similar or identical injuries and common law violations are involved, and common

questions outweigh any potential individual questions.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class or,
Alternatively, the Michigan Subclass)**

77.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully

set forth herein.

78.  Defendants owed duties to Plaintiff and all other class members to exercise

reasonable care in safeguarding and protecting their PII and PHI in Defendants' possession,

custody, or control.

79.  Defendants knew the risks of collecting and storing Plaintiff's and all other class

members' PII and PHI and the importance of maintaining secure systems. Defendants knew of the

many data breaches that targeted healthcare providers in recent years.

75.  Given the nature of Defendants' business, the sensitivity and value of the PII and

PHI they maintain, and the resources at their disposal, Defendants should have identified the

vulnerabilities to their systems and prevented the Data Breach from occurring.

76.  Defendants breached their duties by failing to exercise reasonable care in

safeguarding and protecting Plaintiff's and members' PII/PHI by failing to design, adopt,

implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

77.     It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and class members' PII and PHI to unauthorized individuals.

78.     But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and class members, their PII and PHI would not have been compromised.

79.     As a result of Defendants' above-described wrongful actions, inactions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other class members have suffered, and will continue to suffer, economic damages and other injuries and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk that justifies expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Subclass)**

80.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81.     Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

82.     Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII and PHI.

83.     Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other class members' PII and PHI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtain and store, and the foreseeable consequences of a data breach involving PII and PHI including, specifically, the substantial damages that would result to Plaintiff and the other class members.

84.     Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

85.     Plaintiff and class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

86.     The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

87.     It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and class members' PII and PHI to unauthorized individuals.

88.     The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Subclass)**

89.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     Plaintiff and class members gave Defendants their PII and PHI in confidence, believing that Defendants would protect that information. Plaintiff and class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiff's and class members' PII and PHI created a fiduciary relationship between Defendants and the Class. In light of this relationship, Defendants must act primarily for the benefit of people whose PII and PHI is provided to them, which includes safeguarding and protecting Plaintiff's and class members' PII and PHI.

91.     Defendants have a fiduciary duty to act for the benefit of Plaintiff and class members upon matters within the scope of their relationship. They breached that duty by failing to properly protect the integrity of the systems containing Plaintiff's and class members' PII and PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and class members' PII and PHI that was collected.

92.     As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and the Class have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII and PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Data Breach on their PII and PHI; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Nationwide Class or,
### Alternatively, the Michigan Subclass)

93.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94.     In connection with receiving pharmacy services, Plaintiff and all other class members entered into implied contracts with Defendants.

95.     Pursuant to these implied contracts, Plaintiff and class members paid money to Defendants, whether directly or indirectly through their healthcare providers, insurers, and/or state agencies, and provided Defendants with their PII and PHI. In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide pharmacy services to Plaintiff and class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and class members' PII and PHI; and (3) protect Plaintiff's and class members' PII and PHI in compliance with federal and state laws and regulations and industry standards.

96.     The protection of PII and PHI was a material term of the implied contracts between Plaintiff and class members, on the one hand, and Defendants on the other hand. Indeed, as alleged above, Defendants recognized the importance of data security and the privacy of customers' and serviced individuals' PII and PHI on their websites and in PM's Privacy Policy. Had Plaintiff and class members known that Defendants would not adequately protect their PII and PHI, they would not have entrusted their PII and PHI to Defendants.

97.     Plaintiff and class members performed their obligations under the implied contract when they provided Defendants with their PII and PHI and paid—directly or through intermediaries—for services from Defendants.

98.     Defendants breached their obligations under their implied contracts with Plaintiff and class members in failing to implement and maintain reasonable security measures to protect and secure their PII and PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and class members' PII and PHI in a manner that complies with applicable laws, regulations, and industry standards.

99.     Defendants' breach of their obligations of their implied contracts with Plaintiff and class members directly resulted in the Data Breach and the injuries that Plaintiff and all other class members have suffered from the Data Breach.

100.    Plaintiff and the Class were damaged by Defendants' breach of implied contracts because: (i) they paid—directly or indirectly through their healthcare providers, insurers, and/or state agencies—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII and PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII and PHI has been breached; (v) they were deprived of the value of their PII and PHI, for which there is a well-established national and international market; and/or (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT V**
**INVASION OF PRIVACY**
**(INTRUSION UPON SECLUSION)**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Subclass)**

101.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102.     Plaintiff and class members had a reasonable expectation of privacy in the PII and PHI that Defendants disclosed without authorization.

103.     By failing to keep Plaintiff's and class members' PII and PHI safe and disclosing PHI and PII to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and class members' privacy by, *inter alia*:

    a.    intruding into Plaintiff's and class members' private affairs in a manner that would be highly offensive to a reasonable person;

    b.    invading Plaintiff's and class members' privacy by improperly using their PHI and PII properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

    c.    failing to adequately secure the PII and PHI from disclosure to unauthorized persons;

    d.    enabling the disclosure of Plaintiff's and class members' PII and PHI without consent.

104.     Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and class members' position would consider their actions highly offensive.

105.     Defendants knew that their systems and processes for collecting, managing, storing, and protecting PII and PHI entrusted to them were vulnerable to data breaches prior to the Data Breach.

106.     Defendants invaded Plaintiff's and class members' right to privacy and intruded into Plaintiff's and class members' private affairs by disclosing their PII and PHI to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

107.     As a proximate result of such unauthorized disclosures, Plaintiff's and class members' reasonable expectations of privacy in their PII and PHI were unduly frustrated and

thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and class members' protected privacy interests.

108.    In failing to protect Plaintiff's and class members' PII and PHI, and in disclosing that information, Defendants acted with malice and oppression and in conscious disregard of Plaintiff's and class members' rights to have such information kept confidential and private.

109.    Plaintiff seeks injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

## COUNT VI
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Nationwide Class or,
### Alternatively, the Michigan Subclass)

110.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

111.    This claim is pleaded in the alternative to the breach of implied contract claim.

112.    Plaintiff and class members have both a legal and equitable interest in their PHI and PII that was collected by, stored by, and maintained by Defendants—thus conferring a benefit upon Defendants—that was ultimately compromised by the Data Breach.

113.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and class members. Defendants also benefitted from the receipt of Plaintiff's and class members' PHI and PII.

114.    As a result of Defendants' failure to safeguard and protect PII and PHI, Plaintiff and class members suffered actual damages.

115.    Defendants should not be permitted to retain the benefit belonging to Plaintiff and class members because Defendants failed to adequately implement the data privacy and security procedures that were mandated by federal, state, and local laws and industry standards.

116.    Defendants should be compelled to provide for the benefit of Plaintiff and class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT VII**
**DECLARATORY RELIEF**
**(28 U.S.C. § 2201)**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**Alternatively, the Michigan Subclass)**

117.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118.    An actual controversy has arisen and exists between Plaintiff and class members, on the one hand, and Defendants on the other hand, concerning the Data Breach and Defendants' failure to protect Plaintiff's and class members' PHI and PII, including with respect to the issue of whether Defendants took adequate measures to protect that information. Plaintiff and the Class are entitled to judicial determination as to whether Defendants have performed and are adhering to all data privacy obligations as required by law or otherwise to protect Plaintiff's and class members' PHI and PII from unauthorized access, disclosure, and use.

119.    A judicial determination of the rights and responsibilities of the parties regarding Defendants' privacy policies and whether they failed to adequately protect PHI and PII is necessary and appropriate to determine with certainty the rights of Plaintiff and the Class, and so that there is clarity between the parties as to Defendants' data security obligations with respect to PHI and PII going forward, in view of the ongoing relationships between the parties.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of the Class, respectfully requests that the Court grant the following relief:

A. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as Class Representative and undersigned counsel as Class Counsel;

B. Award Plaintiff and the Class actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C. Award declaratory and injunctive relief as permitted by law or equity to assure that class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D. Award Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Award Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Award Plaintiff and the Class such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 20, 2023                           Respectfully submitted,

/s/ John C. Whitfield, Esq.
John C. Whitfield (KY Bar #76410)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
19 North Main Street
Madisonville, KY 42431
Phone: (270) 821-0656
Facsimile: (270) 825-1163
jwhitfield@milberg.com

E. Michelle Drake (*Pro Hac Vice* forthcoming)
BERGER MONTAGUE, PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413

Tel: (612) 594-5933
Fax: (612) 584-4470
Email: emdrake@bm.net

Mark B. DeSanto (*Pro Hac Vice* forthcoming)
BERGER MONTAGUE, PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: mdesanto@bm.net

*Attorneys for Plaintiff*